oral argument not to exceed 15 minutes per side and Ms. Owens for the appellant. Thank you very much, your honors. May I start now? Yes, you may. My name is Mary Owens. May it please the court. I'm here on behalf of the appellant, Daniel Pittao, and I have not reserved any rebuttal time. And my oral argument is going to be very short. It's been a long morning. I think my brief is pretty comprehensive. As your honor knows, this is a habeas case. Your honors know this is a habeas case. We filed, I believe, six claims and the district court ruled against us on all of them, but did grant us initially a certificate of appealability as to the issue of ineffective assistance of trial counsel. She later expanded the COA to include our claim of a suggestive identification procedure with regard to one of the so-called eyewitnesses. We moved in this court, once we had filed our claim of appeal, to expand the COA to include the request for discovery that we had made in the district court, which the court denied and this court also denied, refused to expand it. So that's not going to be before the court and that's not going to be part of my argument, except perhaps as an aside that trial counsel actually did not investigate the witness who we claimed he was ineffective for not presenting. The only thing I want to say, your honors, and again I'm very grateful that you agreed to hear our oral argument, is that we contend that both the district court and the Michigan courts made an unreasonable finding of the available record concerning what evidence we did present concerning the absent witness, Joyce Willis. When she testified, or she did not testify, but in her affidavit she said that she had been contacted throughout the day by Mr. Pateo and most likely also during the timeline, the prosecution's timeline of when he was available to have killed his wife. The state court said that her affidavit was vague and would not have prevented the jury from finding that he could have killed his wife during the afternoon of November 24th and the district court agreed that her allegations were vague and that therefore under the presumption of correctness established under the AEDPA, the district court had to affirm. But both of those courts misunderstood that Ms. Willis' affidavit, we contend her proffered testimony, which we can't consider, considered with the phone records completely vitiate the prosecution's timeline. The phone records, as I understood it, the phone records only show all the folks in this group within which he worked with Ms. Willis. Partially true, Your Honor. Okay, and how's that? How can that be said to narrow? Because she was able to establish, she was able to identify, even in her affidavit, the particular fax numbers that she used. They were faxing documents back and forth to get ready for this big GM hearing the next day. And although it's true that most of the calls go through the central telephone line at Bardstown at the... What she sends to him... Both. They're faxing back and forth. First you said the faxes she sent to this number. No, I'm sorry. I would think we wouldn't care much about what she sent. We would care what he sent and when. Well... And that is not their counsel. I have to agree with you. I'll be honest. She does not say, I specifically remember him faxing me something at 348 or 357. In fact, I thought that the best she could do for him was 1245, sometime in the late afternoon, but before 1. I disagree with you, Your Honor. I think that's a wrong reading of the fax. She said that they were faxing and communicating back and forth throughout the day. General telephone. I agree. And then she's able to pinpoint the fax numbers that she and he would have been using, or he would have been using. And we think that goes a long way towards establishing a substantial defense. And that, as a matter of fact, that is the standard for ineffective assistance of counsel, particularly as it relates to alibis. Is it a substantial defense? Well, yes, it is. And that's the... To establish an alibi is very substantial. I agree. I agree. And I think that this does that. Okay, but that's where the courts disagree with you, and I haven't heard you say anything that nails it. Right? It has to be, otherwise it's futile. Well, I disagree with that. You know, I thought about that when I was sitting back there. One of the judges is going to say, well, an alibi means you have to show that you were with this person within eyesight for every moment between 1 and 3. I don't think that that's what an alibi really is. I think this establishes that she and he were in constant communication by phone and fax throughout the day, and that if this evidence had been presented to the jury, there's a reasonable likelihood that they would have had reasonable doubt. That's my argument, Your Honors. I think this really is best characterized as something other than alibi evidence. It's really an effort to offer some evidence that shows he was engaged in activity other than murdering his wife on the afternoon of November 24th. Well, that's another way of looking at it. Which I don't really think, I mean, alibi is typically used when you're trying to pinpoint the location of an individual. And this wouldn't really be that and say he's doing something else. Maybe you can call it an alibi, maybe not. Well, I was looking up the definition. What is the strict legal definition of alibi? It means you're elsewhere in the Latin, so you're right. He was elsewhere other than killing his wife. So unless there are some other questions, Your Honor, that is my argument. And as I said, I did not reserve any rebuttal, and I'm very, very grateful that you allowed me to be here. Thank you very much. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Reyna Corbacus from the Michigan Attorney General's Office on behalf of Appalachian Stephen Rivard. The state courts in this case affirmed petitioner's conviction for the brutal murder of 30-year-old Tamara Pateo. The district court denied him habeas relief, and the state asks this court to affirm that denial because petitioner hasn't shown an extreme malfunction in the way that the Michigan Court of Appeals decided his claims. I will also focus on, or first focus on the- Where does the extreme malfunction language come from? That comes from Harrington v. Richter, Your Honor. I thought you probably had a source for it. I do, and it is necessary in order for habeas relief to be granted to show that there was an extreme malfunction in the state court system. And here, petitioner can't show that there was. I will address his claim regarding trial counsel's alleged ineffectiveness for not investigating or calling Joyce Willett. Relief is not warranted on that claim because petitioner cannot establish either prong of Strickland, let alone both, or show that there was no reasonable dispute that the state court in this case was wrong. As this court knows, Strickland is a very general standard, and state courts have more leeway in applying general standards, and the state court here did reasonably apply it. Regarding the performance prong, there was no evidence before the state courts that trial counsel in this case did not contact Joyce Willett. He knew about Willett according to petitioner's own affidavit and his sister's affidavit. He told petitioner's sister that he would contact her. Willett in her initial affidavit didn't say that trial counsel didn't contact her, and a petitioner can't show deficiency based on a lack of evidence, and the Supreme Court in Burt v. Titlow said that. With respect to the 417 video deposition, the district court and this court did properly deny petitioner's request to expand the record, and that's because a petitioner can't expand the record on appeal according to Colin v. Penholster in this court's decision in Ballinger. But even if this court considers that statement in the delayed deposition, it would not have been constitutionally deficient for trial counsel to not further investigate Willett, or to call her at trial given the fact that the statements in that affidavit she made were very vague. They were very speculative. She was not an alibi witness, an airtight alibi witness, or even an alibi witness, and she can't establish that petitioner was at his office past 2 or even 1242. And the trial counsel in this case, who was a very experienced trial attorney, knew that there was no way to tell who was making these phone calls, and he had other evidence, including his client's own statements, that petitioner was not in the office on the afternoon on the 24th. Petitioner made recorded statements to his secretary that he left at 2 that day. There was also other evidence that no other co-worker, including his secretary, saw him in the office that afternoon. His last computer usage was 1242 p.m. And rather than spend time and resources on following up with Willett or calling her at trial, knowing that she would be such a weak witness, trial counsel in this case decided to focus the defense on the victim's death being the next day, and he called a renowned forensic expert to testify to that and support the defense. He vigorously challenged the prosecution's case, including the two witnesses who said that they saw petitioner on the 24th, near the dumpster near the victim's apartment, and made a lot of other arguments, including that the police did a shoddy investigation, that they were biased against petitioner, no physical evidence against petitioner. And what he did with the statements that his client made that he was in the office only until 2 is that he used that to argue that even if the prosecution's theory was right and the victim was killed on the 24th, the one thing anybody would want is an alibi to establish his whereabouts during that time frame. And he argued that petitioner, when he was talking to his secretary, what did he say, that he was there from 10 to 5? No, that he was there from 10 to 2, and that showed that he had nothing to do with the murder. But the focus was on the murder being the next day. That was the primary focus. But counsel did have a response to the prosecution's theory that the murder happened the day before. Again, as I mentioned, this trial attorney was very experienced. He was a tough advocate. He was a former federal prosecutor. He had many years of experience doing trials. He got the first jury in this case to hang, which was pretty remarkable. He did retain this renowned forensic expert, and he vigorously argued on behalf of his client both before trial and during trial. And the trial court at the end of the second trial praised both attorneys for doing such a great job. And as Strickland says, a trial attorney, trial counsel is not required to pursue every defense regardless of its chance of success. And I think trial counsel here made a reasonable decision to not call or pursue calling Joyce Willett as a witness. Petitioner also can't show that the state court's lack of prejudice ruling on this claim was an extreme malfunction. The petitioner must affirmatively show prejudice, and the likelihood of a different result must be substantial and not just conceivable. For many of the same reasons that I mentioned earlier, Willett's statements were vague, speculative, and not very helpful. Yes? Let me ask you, with regard to the photo array, the contention that it might have been obtained by suggestiveness, I guess there was an argument that the police mentioned in advance of the photo array to the witness that the individual drove a blue Jeep. And I guess the implication is that the witness may have remembered that many years ago around the time of the crime, there was an individual who drove the Jeep that the witness could remember, and then subsequently therefore selected that person from the photo array so the whole thing was therefore obtained. And I may have some of these facts a little off a bit, but what do you say about all that? Well, the claim with respect to the identification procedure regarding David Jerome, the problem with petitioner's claim is that he can't establish the factual predicate for it. In other words, he can't show that there was no improper suggestiveness by police. At the initial questioning, when they were canvassing the neighborhood trying to figure out what was going on, at the apartment informational meeting, which took place ten days later, or in giving Jerome the photo array several months after that, there's absolutely no evidence that the police steered Jerome into identifying anybody in the photo array. The photo array consisted of six pictures, computer-generated pictures, and the police, the evidence on the record shows that the police gave the array to Jerome and said, is there anyone you can identify? Does anyone look familiar? Didn't point anyone out, and there's no suggestiveness by the police. And as far as the, or during the investigation regarding, in July of 1998, as far as the car, it was Jerome that had identified, he claimed he had noticed it was the type of car earlier, before he was shown the array. So the police didn't taint him or suggest to him that this was the car. He had himself, in his initial statement, mentioned that he had described it as a black sedan, but then later he explained that he referred to all four-door cars as sedans, and he gave more specific statements about what he saw that day. If I'm remembering correctly, did he first identify it as a Chrysler of some sort? He did. I think in his... The Jeep didn't come immediately. That's right, yeah. In his first statement, which was more vague, and I think it was because the police weren't doing questioning, as detailed questioning, but yes, in his first statement he wrote that it was a black sedan, and then he said at the apartment informational meeting that it was, when they showed several pictures of vehicles, he said that it was a Jeep, a Chrysler product, a Jeep, and then later he expanded on his statements and explained in more detail. But he is the one that brought up that it was a Jeep, an older model Jeep. So the police didn't taint his statements in that respect. Identifying the defendant was a very strong identification of his face. That's the guy, yes indeed, that is he, right? Yes. So the car, okay. Yes, and he made that identification. I believe Petitioner, in his brief, indicates that it wasn't made until the second trial, but that isn't correct. Jerome identified Petitioner as the man he saw on the 24th in his statement made in July of 1998, and he was certain as of that date as to who he saw, and he was also certain when the preliminary exam testimony was read into the record, and he was also certain at trial as well. So the identification came earlier than the second trial. And, again, there's absolutely no evidence that the police were suggestive in any way with respect to Jerome, and because there was no improper suggestiveness, trial counsel in this case was not ineffective for trying to suppress those statements or for conducting a preliminary hearing. It would have been futile. But what trial counsel did do, and reasonably did, is challenge the reliability of those statements at trial through cross-examination, and I just want to point out that he did that extensively, nearly 100 pages of cross-examination of this witness about the changes in the statements, about the lack of completeness, and he cross-examined this witness very thoroughly, and he vigorously argued in closing about the problems with this identification. And I also do disagree with Petitioner's claim that the Michigan Court of Appeals only addressed the photo array in its opinion. The Michigan Court of Appeals stated that Petitioner failed to identify any suggestive identification procedures, and that is true because there is no record evidence of that. Just briefly going back to the ineffective assistance claim regarding Ouellette, the Michigan Court of Appeals reasonably found no prejudice for many of the reasons I indicated earlier, that Ouellette's testimony or statements in the affidavit were vague, and the prosecution also would have destroyed her on cross-examination, her vague statements, her inability to put Petitioner at his office on the afternoon. And even with that testimony, and this is what the district court said, the jury could find that she talked to him in the morning and that he killed the victim in the afternoon, particularly where there was other evidence, including Petitioner's own statements, that he was away from the office in the afternoon. And her testimony regarding Petitioner's normal behavior on the 25th was cumulative to other testimony. And I also just want to point out briefly the very strong evidence in this case. There may not have been direct evidence, but there was very strong evidence of motive and very compelling circumstantial evidence. And at page ID of the record 443 to 71, the prosecution on direct appeal set forth, you know, in detail all the evidence against Petitioner, including the fact that he threatened to kill this victim just a few months before he murdered her, after he chased her down the highway. His history of violence toward her, evidence he was furious that she had filed for divorce, and that he was furious that she was going to testify against him on a couple of misdemeanor cases that were pending. So there was a great deal of evidence against this Petitioner, and counsel's decision or failure to call Joyce Willis as a witness, there's no reasonable probability that would have made a difference in any way at this trial. As this court is aware, habeas is an extraordinary remedy, and the state respectfully asks this court to affirm the denial of habeas relief, and I'm happy to answer any other questions, otherwise I'll rest on the briefs. All right. Thank you very much. Thank you. There seems to be no further questions. The case is submitted. There being no further cases for argument, court may be adjourned.